UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
MELONIE CONNOLLY,

                              Plaintiff,

            -against-                                    **MEMORANDUM & ORDER**
                                                        Civil Action No. 16-1776(DRH)
NANCY A. BERRYHILL[1], Acting
Commissioner of Social Security,

                              Defendant.
--------------------------------------------------------X

**APPEARANCES:**

**The DeHaan Law Firm P.C.**
Attorneys for Plaintiff
300 Rabro Drive East, Suite 101
Hauppauge, New York 11788
By:  John W. DeHaan, Esq.

**Bridget M. Rohde**
**Acting United States Attorney, Eastern District of New York**
Attorney for Defendant
271-A Cadman Plaza East
Brooklyn, New York 11201
By: Candace Scott Appleton, AUSA


**HURLEY, Senior District Judge:**

            Plaintiff Melonie Connolly ("Plaintiff") commenced this action pursuant to 42

U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social

Security (the "Commissioner" or "Defendant") which denied her claim for disability insurance

benefits. Presently before the Court are Plaintiff's motion and Defendant's cross-motion for

judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons

_____
            [1] Nancy A. Berryhill is now the Acting Commissioner of Social Security and is therefore
substituted for Carolyn W. Colvin as the defendant in this suit pursuant to Federal Rule of Civil
Procedure 25(d).

discussed below, Plaintiff's motion is denied and Defendant's cross-motion is granted.

BACKGROUND

## I.    Procedural Background

Plaintiff applied for disability insurance benefits (DIB) on May 8, 2013, alleging disability as of September 16, 2012, due to neck, back, right elbow, right knee, and left ankle impairments. (Transcript ("Tr.") 180, 183.) Plaintiff's DIB claim was denied on August 8, 2013. (Tr. 76-84.) Subsequently, Plaintiff filed a request for a hearing, which hearing was held on October 9,  2014, before administrative law judge ("ALJ") April M. Wexler. (Tr. 104-05, 43-75.) By Notice of Decision - Unfavorable, dated December 14, 2014, the ALJ denied Plaintiff's application for DIB, finding she was not disabled. (Tr. 26-42.) Review by the Appeals Council was requested and on February 25, 2016, the Appeals Council denied the request. (Tr. 14-25, 1-6.) This action followed.

## II.    Factual Background

### A.    Non-Medical Evidence

#### 1.    Plaintiff's Testimony and Function Report

Plaintiff was born in 1976 and is a college graduate.  Her past relevant work consists of police officer for the City of New York and the Port Authority. (Tr. 46-47, 437.)

A function report dated August 6, 2013 was completed on behalf of Plaintiff by her attorney. (Tr 182-91.) It states that she lives in a house with her family and spends her days grooming, eating, attending appointments, resting and relaxing. She cooks and prepare her three meals daily just as she did before the alleged onset date. She does light cleaning but needs help and does not do any outdoor work. She goes outside daily, can both ride in and drive a car, and

shops for personal items and groceries with a family member one or two times a week for about an hour. She watches television daily but can no longer read due to her neck injury. She socializes daily in person "but not like [she] used to." According to the report, she is limited in what she can lift, can only sit for a short period of time, and can climb stairs holding on the railing and taking her time; she has to avoid kneeling and squatting and sometimes her hands gets tired. No limitations were set forth for standing, walking, reaching, seeing, hearing and talking. The distance she can walk before having to stop and rest is not affected.  She reports no problems with personal care except the need to take her time dressing and that she could no longer blow out her hair. In response to the question about what activities she could no longer engage in as a result of her condition, the answer was "work." Plaintiff reports that she first had pain in September 2012 and it affected her activities right away. She described the pain as sharp, tingling, and numbing in the elbow and neck, which radiated from the neck to her back and from her elbow to her lower arm. She experiences it every day for most of the day. (Tr. 182-91.)

Plaintiff testified at the hearing before the ALJ. (Tr. 43-69.) She lives in a ranch home with her husband and has a BA in social work and sociology. She has a driver's license and drives; she is 5'7" tall and weighs 293 lbs. She cannot work due to headaches, neck pain, reduced range of motion as a result of neck fusion surgery, tightness in the shoulders, weakness in her arm, and leg swelling secondary to lymphedema.  Plaintiff developed lymphedema after she had lumbar surgery in 2009, neither of which prevented her from working until 2012 when she was injured on the job. She injured her knee in 2003 and still has pain and swelling as a result once or twice per week. She has weakness in her right hand which cause her to drop things once or twice a week. She cannot perform sedentary work because she is limited in using her right arm, sitting

and looking down. She can walk a mile, but slowly, sit for an hour before needing to stretch, and lift five to ten pounds with her right hand. She cannot squat without pain; she can bend although she has pain when doing so. She goes to physical therapy three times per week for her neck and hand; she takes Aleve or Tylenol for her headaches and uses a Lidoderm pain patch. She wears compression stockings every day for her lymphedema. Once a week she ices or heats her knee; she also does home exercises for her knee and elevates it once a day. She had neck fusion surgery in 2013 that she characterized as "successful," although the plate in her neck makes swallowing difficult and she regurgitates her food. (Tr. 43-69.)

Plaintiff describes her day as waking up, feeding her dog and letting her outside. On Monday, Wednesday, and Friday she goes to physical therapy and then comes home, eats breakfast, and reads a book or the newspaper. She does light cleaning around the house, including loading the dishwasher. Her husband does the laundry. She goes to lunch with her girlfriends and her mother comes over to socialize - not help. She and her mother like to get their hair done, shop together and do "mother/daughter activities." She goes to Manhattan by train or car every six weeks to see Dr. Fisher[2] at the Port Authority. She has a driver's license and can drive using her left hand with no problem. She cooks all of the meals for the week over the weekend. She entertains but her husband does much of the work. She crocheted but difficulty with her hands caused her stop in the past few months. She has gone to the movies only once or twice the past year as they have become expensive. (Tr. 43-69.)

---

[2] During the hearing the ALJ noted that there were no treatment notes from Dr. Fisher. Plaintiff's attorney explained that Plaintiff saw many doctors and associated Dr. Fisher with the Port Authority so his name may have been accidently left off her list of doctors. The attorney stated she would request the records. (Tr. 68-69.)

After her alleged onset date she went to Aruba, Jamaica, and Oktoberfest in Germany. When she went to Oktoberfest and Aruba her husband had to help carry her luggage and bathe and dress her as her arm was in a sling. She received early boarding. While in Jamaica she was able to go to the beach and pool  - she "just basically lounged," "got a nice suntan" and "had a couple of Savasas [sic]."[3]

## 2.    Testimony of Vocational Expert

Rocco J. Meola testified as a vocational expert during the hearing. (Tr. 69-73.) He stated that Plaintiff's past work as a police officer was medium in exertion with an SVP of 6. The ALJ then inquired whether, assuming an individual of claimant's age, education, and past relevant work with the following limitations could perform Plaintiff's past work:

> [L]imited to sedentary work in that she could occasionally lift ten pounds, sit for approximately six hours; stand or walk for approximately two hours in an eight-hour day with normal breaks; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance and stoop, never kneel, crouch or crawl; push and pull is limited to occasional up to the 10 pounds; and must avoid concentrated exposure to extreme heat and cold, wetness humidity, vibrations, noise, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights: and limited to frequent fine fingering with the dominant right hand.

(Tr. 70.) Meola responded she/he could not, but that such an individual could perform the following jobs, all of which are sedentary with an SVP of 2 and exist in significant numbers in the national economy: order clerk, DOT # 209.567-014; a document prep worker, DOT # 249.587-018; and preparer, DOT # 700.687-062. (Tr. 71.)

Meola further testified in response to an inquiry by the ALJ that there would not be

---

[3] Cervasa is Spanish for beer.

significant jobs if the following were added to the hypothetical: "such individual is limited to light work . . . but they can sit for four hours, stand for two hours, walk for two hours; occasionally operate foot controls; never climb ladders, ropes, scaffolds, balance, kneel or crawl; must avoid heights, moving machinery, dusts, odors, fumes, gases, extreme heat and cold; and can be exposed to moderate office noise." (Tr. 71-72.)

On cross-examination Meola testified that the positions of order clerk, doc prep worker and preparer would not be available to a hypothetical person who "was able to sit hours and walk two hours but could only occasionally handle[,] finger . . . and feel with the right dominant hand and never reach overhead or in other directions, push, pull or pull with the right dominant hand and occasionally use the bilateral feet to operate foot controls." Further, given the limitation in terms of the occasional handling and fingering there would be no jobs at the sedentary, unskilled level. Meola also opined that the jobs of order clerk, doc preparation worker, and preparer would be available if the ALJ's hypothetical person was never able to climb ladders or scaffolds, balance, stoop, kneel, crouch or crawl. "[I]f the hypothetical person could only occasionally lift and carry 5 to 10 pounds; could sit for one hour; stand for one hour; walk for one hour at a time for a total of two hours each in an eight hour workday . . . none of those positions would be available." (Tr. 72-73.)

### B.    Medical Evidence - Treating Sources

#### 1.    Steven Beldner, M.D. - Orthopedist

Plaintiff first saw Dr. Beldner on September 19, 2012 for a right elbow injury sustained on September 16 when she tripped over a traffic cone at work and fell. On examination, the elbow showed superficial abrasions, effusion and reduce range of motion but no sign of

instability. Plaintiff's wrist had significant swelling and tenderness but was neurovascularly intact. X-rays showed a fracture of the elbow at the radial neck with acceptable alignment. The x-ray of the right wrist was normal. Dr. Beldner diagnosed fractures of the elbow and wrist and prescribed a wrist splint. He opined that Plaintiff could not work for six to eight weeks. (Tr.359-60.)

Plaintiff returned to Dr. Beldner on October 9, 2012. She reported decreased right wrist pain despite taking off her splint at night contrary to medical advise. Dr. Beldner observed dramatic reduction in right elbow effusion and no tenderness. Range of motion increased but was still reduced. The right wrist was tender; plaintiff's digits moved well and were neurologically intact. He diagnosed closed fracture of the scaphoid bone of wrist and right elbow radial head and recommended a right wrist MRI and occupational therapy. He opined Plaintiff should remain out of work. (Tr. 283-84.)

On November 9, 2012, Plaintiff returned to Dr. Beldner and complained of pain and stiffness in the right elbow. On examination of the elbow, Dr. Beldner found it was neurovascularly intact. There was no tenderness or instability and biceps and triceps were intact. There was mild swelling within the joint and reduced range of motion. Plaintiff's wrist was not tender, with symmetric and full range of motion. X-Rays showed excellent alignment of the prior fracture and Dr. Beldner reported that the wrist injury appeared to have resolved. Plaintiff was to begin occupational therapy for her elbow. (Tr. 285-86.)

Plaintiff last saw Dr. Beldner on November 30, 2012. She stated she had pain and stiffness in the right elbow but it was improving with physical therapy and that she had right forearm pain and right finger numbness especially at night. Dr. Beldner wrote "no Pain" under

his "pain assessment". On examination, the right elbow showed some tenderness and reduced range of motion. The right wrist had full range of motion with no tenderness or instability, Phalen's sign was positive and grip strength was 70 pounds bilaterally. He diagnosed right radial head fracture and carpal tunnel syndrome and found the right elbow well healed. He queried whether her finger numbness was due to cervical problems or peripheral nerve entrapment and ordered electrodiagnostic studies. (Tr. 287-88.)

2.    Michael Shapiro, M.D. - Orthopedist

On September 20, 2012, Plaintiff saw Dr. Shapiro complaining of neck, back and right shoulder pain which she described as constant, dull, aching, tight and tingling. The pain worsened with activity or dampness and was better with cold and rest. Plaintiff estimated her pain as 7/10 that day. She denied having headaches or any joint pain. She weighed 300 pounds. On examination of the neck and lumbar spine, there was reduced range of motion, muscle spasm and pain. Spurling test was negative. Reflexes, sensation, and pulses were all intact and muscle strength in the lower extremities was 4+/5. X-rays of the cervical spine showed straightening consistent with spasm while x-rays of the lumbar and thoracic spines were normal. Dr. Shapiro diagnosed acute cervical sprain, lumbago, and thoracic back sprain. He assessed Plaintiff's temporary disability was total for Worker's Compensation purposes, opining that she could not work due to pain and drowsiness caused by medication. He ordered cervical, lumbar, and thoracic MRIs and prescribed Nucynta and orthotics. (Tr. 304-05.)

The MRIs were conducted on September 21, 2012. The cervical MRI showed spondylitic changes, disc bulging at C3-C4, left posterolateral disc herniation at C5-C6, right posterolateral disc herniation at C6-C7 and stenosis. The thoracic spine MRI indicated mild spondylitic

changes, a small posterior central disc herniation at T5-T6, and a larger paracentral disc herniation at T6-T7 with focal impingement of the anterior margin of the thoracic spinal cord. The lumbar spine MRI revealed status post laminectomy at L4-L5 with spondylitic, no recurrent disc, and degenerative facet hypertrophy at L5-S1. (Tr. 274-76.)

Plaintiff next saw Dr. Shapiro on October 10, 2012. In addition to neck, back, and shoulder pain, she complained of right knee, left knee and left ankle pain which she described as sharp, tight, and tingling. She reported that medication had not been helpful and denied having headaches. She reported her pain as 3-4/10.  Dr. Shapiro reported that his examination revealed reduced range of neck motion, lower extremities muscle strength was 4=/5, and reflexes, sensation and pulses in legs and arms were all in intact. He added herniated cervical nucleus pulposus and cervical radiculopathy to the diagnoses pronounced in his September 20, 2012 notes. (Tr. 306-07.)

On November 19, 2012, Plaintiff again saw Dr. Shapiro, reporting pain in her neck, arm, right elbow, right wrist, right hand, right knee and left ankle, as well as tingling in the middle finger of her right hand. She described the pain as dull/aching and tingling and rated it 8/10 when active and 3/10 when at rest; that day it was 3/10. She denied having headaches and said she had attended four session of physical therapy which helped. On examination, the range of motion of her neck was diminished but sensations in arms and legs were intact. Dr. Shapiro assessed "the percentage of temporary impairment [was] total" and that plaintiff's "[l]imitations include bending/twisting, climbing stairs/ladders, kneeling and lifting." (Tr. 308-09.) He diagnosis remained unchanged and  he continued conservative treatment.

Dr. Shapiro saw Plaintiff on January 7, 2013, at which time she reported she was going to

physical therapy "and making good progress." Dr. Shapiro noted Plaintiff was wearing a brace on her right wrist. His examination revealed diminished range of motion in her neck, her coordination was intact as were sensation in her arms and legs. There was no change in his diagnosis; he prescribed a Lidoderm patch for her thoracic back sprain. He noted that the same limitations set forth on November 19, 2012 prevented her from returning to work. (Tr. 310-12.)

Plaintiff next saw Dr. Shapiro on the 21st of the following month at which time she reported that the pain is 7-8/10 when active, 2-3/10 when at rest, and the severity of the pain is 4. She again described her pain as dull/aching and tingling and reported that physical therapy and medication were helpful. Plaintiff stated that she suffers from headaches. On examination, Dr. Shapiro noted: "Range of motion neck is diminished. Cervical examination reveal pain, muscle spasm, diminished flexibility, diminished extension, diminished rotation and diminished lateral banding." Spurling Exam was positive; Hoffman exam was negative. He diagnosed cervical radiculopathy, herniated nucleus pulposus and cervical lumbago and referred her to Dr. Yadegar for evaluation for pain management. (Tr. 316-17.)

Plaintiff returned to Dr. Shapiro on April 4, 2013 reporting neck and back pain, headaches, and weakness. She rated her pain at 4/10 that day and described it as dull/aching, shooting, tight, and tingling. Dr. Shapiro's examination findings were unchanged from February. He referred Plaintiff for pain management and sought authorization for surgery. (Tr. 315-17.)

Plaintiff again saw Dr. Shapiro again on May 16, 2013 and June 24, 2013. In May, she reported tingling pain in the neck, right wrist, and right hand; she rated her pain 8/10 and denied having headaches. In June, she reported she now had dull/ aching pain in her left arm and hand which she rated as 6-7/10; she denied having headaches. Examination findings at both these

visits were unchanged from February. (Tr. 246-48; 323-24.)

On July 31, 2013, Dr. Shapiro performed an anterior cervical discectomy fusion surgery. During post-operative visits in August and September Plaintiff reported excellent pain relief, although sometime tingling neck pain remained. On August 8, 2013, Plaintiff's pain level was 7 and she reported having headaches. On examination, range of neck motion was diminished, manual muscle testing of the bilateral upper extremities was greater than or equal to 4+/5, and 2+ DTRS and intact sensation in all distributions of the upper extremities. Dr. Shapiro advised her to use a bone stimulator for six months, exercise at home, and to abstain from lifting, carrying, bending, and twisting activities. On August 15, Plaintiff's level of pain was 2 and on August 19 it was 4 and she again reported headaches. Plaintiff reported tingling pain at level 4 on August 26; Dr. Shapiro's examination findings on August 26 were the same as on August 8. (Tr. 325-30; 369-70.)

Plaintiff saw Dr. Shapiro on October 16, 2013, at which time she described her neck pain as sharp and 7/10. On examination, bilateral strength was 4+/5, sensation was full in arms and legs, and the neck revealed muscle spasm. Dr. Shapiro diagnosed status post spinal fusion and myalgia, and administered an injection of Toradol with Lidocaine into the deltoid muscle for spasm. He advised Plaintiff to resume conservative treatment, including physical therapy, massage therapy, acupuncture, or chiropractic care, and opined that Plaintiff was partially permanently disabled for Worker's Compensation purposes. (Tr. 331-32.)

During subsequent visits on December 11, 2013 and January 22, 2014. Plaintiff said she was doing well, getting physical and massage therapy, and assessed her pain as 5/10 and 5-6/10, describing it as dull/achy and/or tight. Dr. Shapiro's examination findings were unchanged. (Tr.

371-74.)

On March 6 and April 23, 2014, Plaintiff again reported only a dull ache and tightness in her neck, assessing her pain level at 5/10 and reporting that medications, physical therapy, massage therapy, and home exercise were helping her pain. She denied having headaches. Examination revealed 4+/5 bilateral arm strength, and full sensation in the arms and legs. Dr. Shapiro recommended home exercise and physical therapy. (Tr. 333-34, 375-76.)

Plaintiff saw Dr. Shapiro on June 19, 2014, at which time she reported that while she had improved since surgery she still had neck pain, which she described as dull, achy, tight, stiff and tingling. She also reported trouble swallowing, back pain, and right arm numbness. Her various types of treatment lessened the pain. Dr. Shapiro noted cervical pain, reduced range of neck and back motion, full sensation in the arms and legs, and strength at 4+/5 in upper extremities. Dr. Shapiro diagnosed lumbago, thoracic herniated nucleus pulposus, and post laminectomy syndrome. He opined that Plaintiff's neck impairment had reached maximum medical improvement and was permanent for Worker's Compensation purposes. (Tr. 335-37.)

A medical source statement, dated August 27, 2014, was completed by Dr. Shapiro. He opined that Plaintiff could occasionally lift/carry 5 to 10 pounds but could never lift more and could lift no amount of weight frequently. She could sit, stand, or walk for less than an hour at a time each, for a total of two hours each per day. Plaintiff needed to lie down and shift positions to alleviate her constant neck and back pain and did not require a cane to ambulate. With her right hand, Plaintiff could never reach overhead or elsewhere or push/pull but could occasionally handle, finger, and feel. With her left hand, she could never push/pull, and could occasionally reach, handle, finger, and feel. Plaintiff could occasionally operate foot controls with her feet and

climb stairs and ramps. She could never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. Plaintiff could never be exposed to unprotected heights, moving mechanical parts, extreme cold or extreme heat, humidity or wetness or vibrations. She could occasionally work with dust, odors, fumes and pulmonary irritants and operate a motor vehicle. Plaintiff could never tolerate very loud or loud noise, could occasionally tolerate moderate noise, and frequently tolerate quiet noise. She had undergone neck surgery and complied with treatment recommendations. Dr. Shapiro indicated Plaintiff could: travel independently; ambulate without assistance; climb a few steps at a reasonable pace; prepare simple meals; care for her hygiene; and shop with assistance. She could not walk a block at a reasonable pace or on uneven surfaces or use public transportation. In support of his conclusions, Dr. Shapiro cited Plaintiff's reports of severe and constant neck and back pain, numbness, stiffness, tightness, and weakness, as well as diminished range of neck and back motion on examination and MRI findings. Dr. Shapiro also cited the fact that she had "losses" and permanent impairment per Worker's Compensation Board guidelines and stated that the limitations assessed dated back to September 16, 2012. (Tr. 268-73.)

    3.    <u>Armand Abulencia, M.D. - Orthopedic Surgeon</u>

On October 25, 2012, Plaintiff saw Dr. Abulencia for right knee and left ankle pain, which she attributed to her fall. She reported experiencing pain every day along the medial joint line of the knee and medial hind foot affecting her daily activities. An examination of her right hip revealed no tenderness and full range of motion. There was no effusion of the right knee but tenderness at the medial joint line; McMurray's test was positive and there was full range of motion. The left knee's skin was in tact, with no effusion or tenderness and full range of motion.

Examination of the right ankle revealed skin intact, no tenderness, and full range of motion. The left ankle had tenderness at the posterior tibial tendon but full range of motion. The right and left feet had full range of motion and toes could flex and extend. X-rays were normal. Dr. Abulencia diagnosed knee internal derangement, knee pain, knee contusion, ankle pain and ankle sprain and recommended physical therapy and injections. He prescribed Diclofenac, ordered MRI's and concluded Plaintiff was unable to work. (Tr. 296-98.)

The MRI's were performed on November 12, 2012. The left ankle MRI showed subcutaneous edema involving the distal calf and foot with several ganglion cysts over the dorsum of the foot adjacent to the talus. There was no tendon or ligament tear and no fracture. The right knee MRI showed an osseous degenerative change with tiny focus of osteochondritis involving the lateral femoral condyle, and small joint effusion. There was no meniscal or ligamentous tear. (Tr. 361-62.)

Plaintiff saw Dr. Abulencia again on November 29, 2012. She reported improvement in her right knee and left ankle. There was localized pain along the knee's anterior aspect every day and lateral hind foot but not every day; there was no numbness or tingling in the foot and no instability. Only her knee affected daily activities. On examination of the right leg, there was tenderness and full range of motion in the hip and knee with no effusion. The left leg had tenderness, swelling, and reduced range of motion. He noted the MRI taken November 12, 2012, showed no meniscal or tendon tears. Dr. Abulencia diagnosed knee contusion and ankle sprain and prescribed physical therapy and recommended a steroid injection. (Tr. 299-301.)

On February 21, 2013 Plaintiff reported to Dr. Abulencia that she was feeling much better, she did not have daily pain and her activities of daily living were not being impacted.

Examination of the left knee was normal. The examination of the right knee revealed tenderness but no effusion or laxity and range of motion was full. He diagnosed chondromalacia patella, knee pain, and ankle sprain and advised Plaintiff to engage in activities as tolerated. (Tr. 302-03.)

A medical source statement, dated June 17, 2013, was completed by Dr. Abulencia. His treating diagnoses were right knee contusion and chondromalacia patella, and left ankle sprain. Plaintiff's only symptom was pain which had resolved by February 2013 with physical therapy and medication. Range of motion in the left ankle was full and flexion-extension in the right knee was to 135 degrees. Plaintiff had no gait abnormality and did not use any assistive devices. She could perform all activities of daily living and, according to Dr. Abulencia had no limitations in lifting and carrying, standing and/or walking; sitting; pushing or pulling. (Tr. 236-45.)

### 4. Anthony Adamo, D.O. - Neurologist

Plaintiff was referred to Dr. Adamo by Dr. Beldner and saw him on December 10, 2012. She reported right arm numbness, particularly in the hand. Neurological examination was normal. There was no focal weakness and motor tone, bulk and power were adequate. Deep tendon reflexes were symmetric and sensation was intact. He performed an EMG and NCV studies of the upper extremities, which were negative and did not establish evidence of cervical radiculopathy, radial neuropathy, or other mononeuropathy. (Tr. 291-95.)

### 5. Arash Yadegar, M.D. - Pain Management Specialist

On April 10, 2013, Plaintiff saw Dr. Yadegar and reported she had pain in her neck, right arm, and right hand, which she described as constant, dull/aching, shooting, and tingling and accompanied by weakness. Plaintiff rated her pain as 7-8/10 with activity and 4-6/10 with rest and reported that it was exacerbated with lifting and interfered with her ability to perform

household chores, sleep, drive, and write. On examination of her neck, Dr. Yadegar noted no tenderness to palpitation over the bilateral cervical paraspinal muscles, the bilateral trapezius and the midline. The Spurling test was positive on the right. Sensation was normal in arms and legs and muscle strength in both arms was greater than or equal to 4+/5. The Hoffman exam was negative bilaterally and there was no pain bilaterally with Facet loading. Dr. Yadegar diagnosed cervical radiculopathy and herniated nucleus pulposus cervical. He assessed temporary total disability for Workers' Compensation purposes, citing limitations in lifting and operating heavy machinery. (Tr. 318-20.)

On April 25, 2013 Dr. Yadegar administered a cervical epidural injection at C7-T1 without complication. (Tr. 281-82.)

Plaintiff returned to Dr. Yadegar on May 1, 2013. She reported that she had tingling, radiating pain in her right arm at a level of 7-9/10 and that lifting and physical therapy exacerbated the pain. She denied headaches or joint pain. On examination, Dr. Yadegar again noted no tenderness to palpitation over the bilateral cervical paraspinal muscles, the bilateral trapezius and the midline, a positive Spurling test on the right, normal sensation in arms and legs, muscle strength in both arms was greater than or equal to 4+/5, the Hoffman exam was negative bilaterally, and there was no pain bilaterally with Facet loading. His diagnosis remained the same. He prescribed continued home exercises, stretching, activity modification, physical therapy and conservative care, while noting "patient with no relief with [unreadable], will refer to shapiro [sic] for surgical intervention." (Tr. 366-68.)

6.    Stanley Weindorf, M.D.

Plaintiff's was examined on August 6, 2014 by Dr. Weindorf. The bulk of the

examination materials consists of Plaintiff's subjective complaint report (Tr. 351-58); there is one page of doctor's notes that this Court finds unreadable (Tr. 350).

In his medical source statement dated September 23, 2014, Dr. Weindorf notes he began treating Plaintiff for leg swelling in August 2011. Dr. Weindorf opined that she could occasionally lift and carry up to 20 pounds, sit for one hour without interruption and up to two hours each day, and stand and walk for less than one hour without interruption and up to two hours each day. Dr. Weindorf indicated not applicable for use of hands. She could occasionally operate foot controls; never climb ladders or scaffolds; never balance, kneel or crawl; and occasionally climb stairs and ramps, stoop and crouch. She could never be exposed to unprotected heights, moving mechanical parts, dust, odors, fumes, pulmonary irritants, extreme cold or extreme heat. She could occasionally work with humidity or wetness and vibrations, frequently operate a motor vehicle and tolerate moderate office noise. She could shop, travel independently, ambulate without assistance, walk a block at a reasonable pace and on uneven surfaces, climb a few steps at a reasonable pace, prepare simple meals, and care for her hygiene. She could not use public transportation. In support of his assessment, he cited limb measurements, his physical examinations, and Plaintiff's reports. (Tr. 344-49.)

### C. Medical Evidence - Non-treating Sources

Plaintiff was not referred for any consultative examinations.

## DISCUSSION

## I. Standard of Review

### A. Review of the ALJ's Decision

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner of Social Security, with or without remanding the cause for a rehearing." 42

U.S.C. § 405(g). The Court may set aside a determination of the ALJ only if it is "based upon

legal error or is not supported by substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d

Cir. 1999) (internal quotation marks and citation omitted). "Substantial evidence is 'more than a

mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to

support a conclusion.'" *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003) (quoting

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)). An ALJ's findings may properly rest on

substantial evidence even where he or she fails to "recite every piece of evidence that contributed

to the decision, so long as the record 'permits [the Court] to glean the rationale of [his or her]

decision.' " *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (quoting *Mongeur v.

Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). This remains true "even if contrary evidence

exists." *Mackey v. Barnhart*, 306 F. Supp. 337, 340 (E.D.N.Y. 2004)

Furthermore, the findings of the Commissioner as to any fact, if supported by substantial

evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the

case de novo. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (internal quotation marks

and citation omitted). Thus the only issue before the Court is whether the ALJ's finding that

Plaintiff was not eligible for disability benefits was "based on legal error or is not supported by

substantial evidence." *Rosa*, 168 F.3d at 77.

### B.     Eligibility for Disability Benefits

#### 1.     *The Five-Step Analysis of Disability Claims*

To be eligible for disability benefits under the Social Security Act (the "SSA"), a claimant

must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA further states that this impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id*. § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims. See 20 C.F.R. § 404.1520. This Circuit has described the procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

### C. The Treating Physician Rule

Social Security regulations require that an ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa*, 168 F.3d at 78-79. The "treating physician rule" does not apply, however, when the treating physician's opinion is inconsistent with the other substantial evidence in the record, "such as the opinions of other medical experts." *Hallora*n, 362 F.3d at 32; *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). When the treating physician's opinion is not given controlling weight, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). These factors include: (1) the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors that are brought to the attention of the Social Security Administration that tend to support or contradict the opinion. *Id*. § 404.1527(d)(2)(I-ii) & (d)(3-6); *see also Halloran*, 362 F.3d at 32. Furthermore, when giving the treating physician's opinion less than controlling weight, the ALJ must provide the claimant with good reasons for doing so. 20 C.F.R. § 404.1527(d)(2).

It is well-settled, however, that a "medical source's conclusion that an individual is disabled is not entitled to controlling weight." *Bynum v. Astrue*, 2013 WL 1873286, * 2 (E.D.N.Y. May 3, 2013). Such statements do not come within the purview of the Treating

Physician Rule; the ultimate finding of whether a claimant is disabled is an issue reserved to the Commissioner. *Snell v. Apfel*, 177 F.3d 128 (2d Cir. 1999); *Bynum*, 2013 WL 1873286; 20 C.F.R. §§ 404.1527(d)-(d)(1), 416.927(d)-(d)(1). Similarly, opinions regarding disability in the Workers' Compensation context are not binding as the standards which govern Workers' Compensation and DIB benefits are not the same. *Bynum*, 2013 WL 1873286, * 3; *Rosado v. Shalala*, 868 F. Supp. 471, 473 (E.D.N.Y. 1994).

## II.     The ALJ's Decision

Applying the five-step analysis enumerated in 20 C.F.R. § 404.1520, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of September 16, 2012. (Tr. 31.) Proceeding to step two, the ALJ determined that Plaintiff has the following severe impairments: degenerative disk disease of the cervical spine (status post cervical fusion) and status post elbow injury. *Id*.

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 32.)

The ALJ then determined that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R.404.1567(a) except that she "is able to occasionally climb ramps or stairs; should never climb ladders, ropes or scaffolds; never balance, stoop, kneel, crouch or crawl, push or pull; must avoid concentrated exposure to extreme heat and cold, wetness, humidity, vibrations, noise, fumes, odors, dusts, gases, poor ventilation and hazards such as machinery and heights; and is limited to frequent fine fingering with her dominant right hand. She is able to occasionally lift ten pounds and, in an eight-hour workday, sit

for approximately six hours and stand or walk for approximately two hours." (Tr. 32-36.) In reaching this determination, the ALJ found that Plaintiff's medically determinable impairments could be expected to cause her alleged symptoms but her statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely credible. (*Id.* at 36.) The ALJ reviewed all the medical evidence submitted, including the August 27, 2014 medical assessment of Dr. Shapiro to which she afforded "little weight . . . because of numerous inconsistencies with the balance of the evidence."

> For instance, there is no support for the assertion that the claimant is incapable of reaching in any direction, ever, with the upper right extremity - and can do so only occasionally with the left upper extremity - considering that she engages in a full range of activities of daily living, including driving, traveling, cooking and shopping, and has undergone only conservative treatment for the past 17 months. Furthermore, considering that the assertion was made on August 6, 2013, that her impairment "does not affect" her ability to walk (Exhibit 5F, page 9), and in light of her testimony that she is able to walk a mile, no weight can be given to the assertion that she has the severe limitations of walking asserted by Dr. Shapiro. Also the declaration stands in contrast to Dr. Shapiro's declaration on November 25, 2013, that the claimant has only a "partial disability" and that her pain level was as low as "2" on August 15, 2013, and generally in the range of "3" or "4" on a pain scale from "1" to "10," reaching "7" only when last seen on October 16, 2013. These inconsistencies cast doubt upon the reliability of Dr. Shapiro's opinion.

(Tr. at 35.)

Turning then to the September 23, 2014 report of Dr. Weindorf, the ALJ gave it "[c]onsiderable but not controlling weight."

> It is considerable less restrictive than Dr. Shapiro's assessment, and it seems reasonable to accept his assertion that the claimant is unable to stand/walk more than a total of two hours in an eight-hour workday, as well as the claims of postural and

> environment limitations, but the assertions that, *inter alia*, the
> claimant is limited to sitting no more than a total of four hours in
> an eight-hour workday is discounted in light of claimant's
> testimony about her activities of daily living and her trips to Aruba,
> Jamaica and Germany."

(Tr. 35-36.)

Addressing Plaintiff's credibility, the ALJ pointed to her testimony that she engages in a full range of daily activities and her travel to Germany, Aruba and Jamaica. The ALJ also considered that Plaintiff's testimony about her signs and symptoms were "not well supported by clinical or diagnostic finding" and that "[h]er characterization of pain and symptoms is not consistent with her medical records. The record does not show any side effects of medications." In the ALJ's opinion, "[t]hese factors all cast doubt upon the claimant's allegations." (Tr. 36.)

At step four, the ALJ determined that Plaintiff is unable to perform any past relevant work. (Tr. 37.) Proceeding to step five and considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ determined, based on the testimony of the vocational expert, that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. (*Id*.)

## III.    Summary of Arguments

Plaintiff asserts that the matter should be remanded for a determination of benefits or alternatively for a new hearing for two reasons: (1) the ALJ failed to follow the treating physician rule in that she failed to afford adequate weight to the Plaintiff's examining physicians medical assessments in determining Plaintiff's RFC; and (2) the ALJ did not properly evaluate Plaintiff's credibility.

Defendant argues that the ALJ's correctly evaluated the medical evidence and her RFC

determination is supported by substantial evidence. With respect to the weight afforded Drs. Weindorf's and Shapiro's assessments, Defendant maintains the weight afforded those opinions was proper in light of the evidence as a whole. Finally, Plaintiff's credibility was properly evaluated in view of, inter alia, Plaintiff's ability to engage in a full range of daily activities, her foreign travel, and the lack of clinical or diagnostic findings to support much of her testimony.

## IV.     Application of the Governing Law to the Present Facts

After a careful review of the record in this case, the Court concludes that the ALJ's conclusions are supported by substantial evidence and she applied the correct legal standards.

### A.     The ALJ Properly Evaluated the Medical Evidence

An ALJ must accord "controlling weight" to a treating physician's medical opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Inversely, the opinions of a treating physician "need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted).

In affording less than controlling weight to the opinion of a treating physician, an ALJ must "consider various 'factors' to determine how much weight to give to the opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)).  Among the factors to be considered are: (1) the frequently, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist. *See Selian v. Astrue*, 708 F.3d 409 (2d Cir. 2013).

Where the ALJ comprehensively explains the reasons for discounting the treating sources opinion, he complied with the dictates of the treating physician rule. *See Cichocki v. Astrue*, 534 F. Appx. 71, 75 (2d Cir. 2013). "[R]ote recitation of every factor is not required, as long as the ALJ's reasoning and adherence to the regulation are clear. At core, an ALJ must 'comprehensively' explain the reasons for the weight he or she ultimately assigns to a treating physician." *Rosario v. Colvin*, 2017 WL 1314215 (S.D.N.Y. Feb. 7, 2017) (citing *Atwater v. Astrue*, 512 Fed. Appx. 67, 70 (2d Cir. 2013); *Burgess v. Astrue*, 537 F. 3d 117, 129 (2d Cir. 2008)).

A careful review of the record reveals that the ALJ correctly applied the treating physician rule. The ALJ explained that she decided to afford the opinion of Dr. Shapiro little weight because of "numerous inconsistencies with the balance of the evidence" and that she gave "[c]onsiderable - but not great or controlling - weight" to Dr. Weindorf's opinion.

Addressing first his opinion regarding the limitations on Plaintiff's ability to reach, the ALJ found it inconsistent with Plaintiff's ability "to engage in a full range of activities of daily living including driving a car, traveling, cooking and shopping" and that her treatment over the past 17 months was "conservative." Other relevant evidence in the record includes (1) Dr. Beldner's findings that Plaintiff was moving her digits well, that they were neurologically intact, and her bilateral grip strength was 70 pounds; (2) Dr. Adamo's neurological examination of Plaintiff's right hand and arm was normal with motor tone, bulk and power adequate and sensation in tact; (3) Plaintiff's report to Dr. Weindorf that she did not have trouble reaching down; and (4) Dr. Shapiro's consistent examination findings that Plaintiff's bilateral arm strength was 4+/5 and sensation was intact.

With respect to Dr. Shapiro's assessed severe limitation on walking, the ALJ noted it was inconsistent with Plaintiff's August 2013 assertion that her impairment does not affect her ability to walk and her hearing testimony that she is able to walk a mile. Other evidence in the record also contradicts his assessment. For example, Dr. Shapiro consistently found Plaintiff had 4+/5 strength and intact reflexes and sensation in her legs and did not include walking in the treatment notes that outlined Plaintiff's physical limitations. Furthermore, Dr. Abulencia's examination of Plaintiff's right knee and left ankle were normal and he opined that she had no limitations vis a vis, inter alia, standing or walking.

The ALJ supported the weight given to Dr. Shapiro's and Dr Weindorf's[4] sitting limitation by citing its inconsistency with Plaintiff's daily living activities and her foreign travel. Also relevant are Plaintiff's report to Dr. Weindorf that she did not have difficulty sitting for prolonged periods, the absence of positive straight legs raises and motor or neurological deficits in her extremities on Dr. Shapiro's examinations of Plaintiff's back, and Dr. Abulencia's medical source statement. The Court finds unavailing Plaintiff's argument that the ALJ improperly relied on her foreign travel as "she had significant difficulty traveling and required special accommodations from the airlines and significant assistance from her husband." Pl.'s Mem. at 19. The only difficulty she testified to at the hearing was bathing and dressing and needing assistance to carry her luggage, none of which are relevant to her ability to sit. Absent was any testimony that she had difficulty sitting on these flights. Moreover, as Defendant points out, the special accommodation she received was early boarding, "which only means she sat on the plane

---

[4] The ALJ accepted Dr. Weindorf's assessment that Plaintiff was unable to stand/walk more than a total of two hours in an eight-hour day, as well as the postural and environmental limitations he posited.

longer." Def.'s Mem. in Supp. of Cross-Motion, at pp. 32-33.

Given that Dr. Shapiro's opinion as the Plaintiff's capacity to sit, stand, walk and reach was inconsistent with other substantial evidence in the record as a whole, it was proper for the ALJ to give it less than controlling weight. *See*, *e.g.*, *Van Dien v. Barnhart*, 2006 WL 785281, at *13 (S.D.N.Y. Mar. 24, 2006); *see generally Halloran*, 362 F.3d at 32. Similarly, discounting Dr. Weindorf's opinion that Plaintiff was limited to sitting no more than a total of four hours in an eight-hour day given Plaintiff's travel and daily activities and the other evidence referred to above did not violate the treating physician rule. Having considered all of Plaintiff's arguments, the Court finds that the ALJ properly applied the treating physician rule in determining Plaintiff's RFC; there was no legal error and the ALJ's determination is supported by substantial evidence.

### B.    The ALJ Properly Evaluated Claimant's Credibility

Social Security regulations require an ALJ to consider a claimant's subjective testimony regarding her symptoms when analyzing whether she is disabled.  *See* 20 C.F.R. § 404.1529(a). A credibility finding by an ALJ is entitled to deference by a reviewing court "because [the ALJ] heard plaintiff's testimony and observed [plaintiff's] demeanor." *Gernavage v. Shalala*, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995).  The regulations contemplate a two-step process to evaluate a claimant's subjective testimony regarding her symptoms.  First, the ALJ must determine "whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce" the claimed symptoms.  *See* SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).  Here, the ALJ found that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (Tr. 46.)

Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the

individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7p, 1996 WL 374186 at *2. If a claimant's subjective evidence of pain is supported by objective medical evidence, it is entitled to "great weight." *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (internal quotation marks omitted). If, however, a claimant's reported symptoms suggest a greater severity of impairment than can be demonstrated by the objective medical evidence, additional factors must be considered. *See* 20 C.F.R. § 404.1529(c)(3). These include daily activities, the location, duration, frequency and intensity of symptoms, the type, effectiveness and side effects of medication, and other treatment or measures to relieve those symptoms. *Id.* "While it is 'not sufficient for the ALJ to make a single, conclusory statement that' the claimant is not credible or simply recite the relevant factors, remand is not required where 'the evidence of record permits [the Court] to glean the rationale of the ALJ's [credibility] decision.' " *Cichocki v. Astrue*, 534 Fed. App'x 71, 76 (2d Cir. 2013) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). In such a case, "the ALJ's failure to discuss those factors not relevant to [her] credibility determination does not require remand." *Id.*

In the present case, the ALJ concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 36.) The ALJ adequately explained the reasons for this finding. Included in the ALJ's reasons were the full range of daily activities and foreign travel engaged in by Plaintiff, as well as the lack of clinical or diagnostic findings supporting her testimony regarding her symptoms and limitations. *Cf. Wright v. Berryhill*, – Fed. App'x –, 2017 WL 1379389 (2d Cir. Apr. 14, 2017) (finding it was proper for ALJ to consider, among other things, the range of activities in which the Plaintiff

had engaged in finding diminished credibility).

The Court agrees with the ALJ's conclusion that plaintiff's testimony regarding the limiting effects of her medical impairment was not substantiated by objective medical evidence. The ALJ's task, then, was to "make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *2; *Vargas v. Astrue*, 2011 WL 2946371, at *15 (S.D.N.Y. July 20, 2011) (stating that if an ALJ's credibility determination is supported by substantial evidence, it must be upheld) (citing *Aponte v. Sec'y, Dept. of Health & Human Servs.*, 728 F.2d 558, 591 (2d Cir. 1984)). Here, the ALJ found that the claimant's statements regarding her activities of daily living and travel abroad were inconsistent with her claimed limitations and her characterization of pain and symptoms inconsistent with her medical records.

The Court finds that the ALJ's findings as to Plaintiff's credibility are supported by substantial evidence and are, therefore, upheld.

## CONCLUSION

For the reasons set forth herein, Plaintiff's motion for judgment on the pleadings is denied and Defendant's cross-motion for judgment on the pleadings is granted. The Clerk of Court is directed to enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated: Central Islip, New York        s/ Denis R. Hurley
       June 2, 2017               Denis R. Hurley
                             United States District Judge